# United States Court of Appeals
## For the First Circuit

No. 21-1064

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ RUVALCABA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Barron, Selya, and Gelpí, Circuit Judges.

Brandon Sample, with whom Brandon Sample PLC was on brief,
for appellant.
Jennifer Zacks, Assistant United States Attorney, with whom
Nathaniel R. Mendell, Acting United States Attorney, was on brief,
for appellee.

February 15, 2022

**SELYA**, **Circuit Judge**.  Presently before us is an appeal brought by defendant-appellant José Ruvalcaba, who is serving a life sentence for having led a drug-trafficking conspiracy.  The appeal raises questions of first impression in this circuit.

To frame those questions, we note that the defendant's life sentence, imposed in 2009, encompassed a mandatory minimum, see 21 U.S.C. § 841(b)(1)(A) (2006), triggered by two prior convictions for felony drug offenses.  While the defendant was serving his sentence, Congress passed the First Step Act (FSA) in December of 2018.  See Pub. L. No. 115-391, 132 Stat. 5194.  As relevant here, the FSA reduced certain enhanced mandatory minimum penalties (including those pursuant to section 841(b)(1)(A)) and modified the criteria for qualifying prior offenses.  See id. § 401, 132 Stat. at 5220.  At the same time, the FSA amended the compassionate-release statute, see 18 U.S.C. § 3582(c)(1)(A), to allow prisoners to file their own motions for compassionate release, see FSA § 603(b), 132 Stat. at 5239.

In the wake of these changes, the defendant moved for compassionate release under section 3582(c)(1)(A)(i), alleging that there were extraordinary and compelling reasons for his release.  The government opposed the motion.  The district court, in an unpublished order, refused the requested relief.

On appeal, the defendant broadly contends that the district court erred by concluding that it lacked the authority to

reduce his sentence because the FSA's changes could not support an extraordinary and compelling reason for compassionate release. We have not yet spoken definitively on the extent of a district court's discretion in determining whether extraordinary and compelling reasons for compassionate release exist. Specifically, we have yet to resolve whether the Sentencing Commission's current policy statement (USSG §1B1.13) is applicable to and, thus, binding upon district courts in adjudicating prisoner-initiated motions for compassionate release. Nor have we yet resolved whether a district court — when confronted with such a motion — may consider certain of the FSA's changes that were not made retroactive to sentences previously imposed.

After careful consideration, we hold that a district court — when adjudicating a prisoner-initiated motion for compassionate release — is not bound by the Sentencing Commission's current policy statement. We further hold that such a court may consider the FSA's non-retroactive changes in sentencing law on an individualized basis, grounded in a defendant's particular circumstances, to determine whether an extraordinary and compelling reason exists for compassionate release. Accordingly, we vacate the order of the district court and remand for further proceedings consistent with this opinion.

## I

Our journey starts with a rehearsal of the relevant facts and travel of the case, including a description of the pertinent aspects of the FSA and the law pertaining to compassionate release.

The defendant led a sprawling drug-distribution and money-laundering conspiracy in the early 2000s. After his apprehension, the defendant was tried and found guilty of involvement in two interlocking conspiracies: a conspiracy to distribute and to possess with intent to distribute over 500 grams of methamphetamine, see 21 U.S.C. § 846, and a conspiracy to launder money, see 18 U.S.C. § 1956(h). On April 28, 2009, the district court sentenced him to life imprisonment on the drug-trafficking charge and to a concurrent 240-month term of immurement on the money-laundering charge. The defendant appealed, and we summarily affirmed. See United States v. Ruvalcaba, No. 09-1650 (1st. Cir. Jan. 7, 2010) (unpublished judgment).

The lifetime term of imprisonment reflected the enhanced mandatory minimum penalty that Congress had prescribed for defendants with two prior "felony drug offense[s]" pursuant to section 841(b)(1)(A). See 21 U.S.C. § 841(b)(1)(A) (2006). At the time of sentencing, the defendant had two earlier California felony drug convictions: a 2001 conviction for importation, sale, and distribution of methamphetamine and a 2001 conviction for possession of methamphetamine.

We fast-forward to the spring of 2020, when the defendant moved for compassionate release under section 3582(c)(1)(A)(i), as amended by the FSA. Two of the FSA's provisions are critically important to the defendant's compassionate-release motion. First, during the more than thirty years before the FSA's passage, any motion for compassionate release had to be filed by the Director of the federal Bureau of Prisons (BOP). See 18 U.S.C. § 3582(c)(1)(A) (2012). The FSA amended the statute, allowing prisoners to file such motions on their own should the BOP decline to act.[1] See FSA § 603(b), 132 Stat. at 5239.

Second, the FSA reconfigured the sentencing landscape through a series of revisions. Pertinently, it altered the scope of the statutory mandatory minimum penalties imposed pursuant to 21 U.S.C. § 841(b)(1)(A). See FSA § 401, 132 Stat. at 5220-21. This amendment reduced the mandatory minimum penalties in that section such that a defendant who had two or more prior qualifying convictions for drug offenses was no longer subject to a mandatory term of life imprisonment but, rather, to an incarcerative term of twenty-five years. See id. § 401(a)(2), 132 Stat. at 5220. For

---

[1] As we noted in United States v. Saccoccia, 10 F.4th 1 (1st Cir. 2021), "[s]uch motions are variously referred to as sentence-reduction motions and compassionate-release motions." Id. at 4 n.2. In this case, as in Saccoccia, "[w]e use those terms interchangeably." Id. In adopting this approach, we in no way suggest that release from imprisonment is the only form of relief contemplated under section 3582(c)(1)(A). After all, section 3582(c)(1)(A) refers to sentence reductions generally.

a defendant with only one qualifying prior conviction, the mandatory minimum term was reduced from twenty years to fifteen years. See id. And as part and parcel of this series of changes, the FSA modified the criteria for qualifying prior offenses by replacing the term "felony drug offense" with the newly-defined terms "serious drug felony" and "serious violent felony." Id. § 401(a)(1), 132 Stat. at 5220.

Congress did not make these changes — found in section 401 of the FSA — applicable to all persons previously convicted under section 841(b)(1)(A). Instead, Congress limited the retroactivity of those amendments. Id. § 401(c), 132 Stat. at 5221 ("[Section 401], and the amendments made by this section, shall apply to any offense that was committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment.").

Marshalling his case for compassionate release, the defendant emphasized that had he been sentenced after the enactment of the FSA, he would have had just one qualifying prior offense and would have been subject to a mandatory prison term of only fifteen years. His life sentence was so much more draconian that, in his view, the resultant sentencing disparity was "extraordinary and compelling." This was especially true, he added, because he

was only forty-five years old and had been incarcerated on the drug-trafficking conspiracy charge for fourteen of those years.[2]

The defendant offered an alternative ground for compassionate release. His medical issues, he said, justified a sentence reduction. In a supplemental motion, he added that his medical conditions — along with the conditions of his confinement — rendered him uniquely susceptible to severe illness or death from COVID-19.

The district court denied the defendant's motions. As an initial matter, the court determined that the defendant had adequately exhausted his administrative remedies. See 18 U.S.C. § 3582(c)(1)(A). The court then turned to the question of whether an extraordinary and compelling reason existed sufficient to warrant compassionate release. Taking the first step along this road, the court explained that although the Sentencing Commission's current policy statement did not "directly address the FSA's" amendments to the compassionate-release statute, it "provide[d] helpful guidance." The court then rejected the

_____

[2] The defendant argued, in the alternative, that the district court should reduce his sentence to twenty-five years even if both of his prior offenses continued to rank as qualifying offenses. We note, moreover, that neither party discusses the significance, if any, of the money-laundering sentence vis-à-vis the defendant's quest for compassionate release. These matters — to the extent that they are relevant — may be explored by the district court on remand, but they have no bearing on the issues that are now before us.

- 7 -

defendant's "medical conditions" argument, reasoning that the BOP could adequately address the defendant's medical issues and that there was no persuasive evidence that the defendant was particularly susceptible to the ravages of COVID-19.

Shifting its focus to the FSA's reduction of the mandatory minimum penalties and the simultaneous modifications of the criteria for qualifying prior offenses, the district court disagreed that those changes could be an element of an extraordinary and compelling reason for compassionate release. In the court's estimation, the changes were prospective in effect and, therefore, any ensuing disparity could not be deemed extraordinary. To rule otherwise, the court suggested, would result in an inappropriate judicial exception to the prospective effect of the FSA's amendments and offend the principle that "[t]he court may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c).

This timely appeal followed. In it, the defendant challenges the district court's refusal to consider the FSA's non-retroactive changes in sentencing law as part of the "extraordinary and compelling" calculus. He does not challenge the district court's rejection of his plaint that his medical issues, standing alone, warranted compassionate release.

Section 3582(c)(1)(A) authorizes a court to reduce a term of imprisonment when "extraordinary and compelling reasons warrant such a reduction."[3] A prisoner seeking such relief may file a motion after exhausting his administrative remedies. See 18 U.S.C. § 3582(c)(1)(A); United States v. Texeira-Nieves, 23 F.4th 48, 52-53 (1st Cir. 2022). To grant the motion, the district court must find both that the defendant has presented an "extraordinary and compelling" reason warranting a sentence reduction, 18 U.S.C. § 3582(c)(1)(A)(i), and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," id. § 3582(c)(1)(A). In addition, the district court must consider any applicable section 3553(a) factors, see id., and "determine whether, in its discretion, the reduction . . . is warranted in whole or in part under the particular circumstances of the case," United States v. Saccoccia, 10 F.4th 1, 4 (1st Cir. 2021) (omission in original) (quoting Dillon v. United States, 560 U.S. 817, 827 (2010)).

---

[3] The compassionate-release statute further provides that a district court may grant relief to some prisoners who are at least seventy years of age, who have served at least thirty years, and who are not found to be "a danger to the safety of any other person or the community." 18 U.S.C. § 3582(c)(1)(A)(ii); see United States v. Texeira-Nieves, 23 F.4th 48, 54 n.3 (1st Cir. 2022). This provision is not implicated here.

We review a district court's denial of a compassionate-release motion for abuse of discretion. See, e.g., id. at 4-5. This standard is not monolithic and, under it, we review embedded questions of law de novo and embedded findings of fact for clear error. See United States v. Vélez-Andino, 12 F.4th 105, 112 (1st Cir. 2021); Saccoccia, 10 F.4th at 5.

In the case at hand, the defendant argues that the district court erred as a matter of law when it concluded that the FSA's changes to the mandatory minimum penalties in section 841(b)(1)(A) and to the criteria for qualifying offenses could never form part of the basis for granting a compassionate-release motion. This argument raises questions of law, which engender de novo review. See Texeira-Nieves, 23 F.4th at 55; Saccoccia, 10 F.4th at 4-5.

Our analysis proceeds in three parts. First, we address whether the Sentencing Commission's current policy statement on compassionate release is applicable to prisoner-initiated motions.[4] Second — after concluding that the policy statement is presently no bar — we proceed to examine whether a district court

---

[4] The government suggests that we need not reach this issue. But the government also suggests that we should affirm on the grounds that the policy statement is binding. See United States v. Rodríguez-Peña, 470 F.3d 431, 433 (1st Cir. 2006) (per curiam) (stating that court of appeals may affirm on any basis apparent from the record). We address the authority of the policy statement to explain why we cannot affirm on the alternative basis suggested by the government.

may permissibly consider those prospective changes on an individualized basis to find an extraordinary and compelling reason warranting compassionate release. Third, we briefly address an alternative ground for affirmance advanced by the government.

**A**

Section 3582(c)(1)(A) requires that a sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). In other words, "applicable policy statements" issued by the Sentencing Commission are binding on courts reviewing compassionate-release motions. See Saccoccia, 10 F.4th at 7 (citing Dillon, 560 U.S. at 826-27).

For over twenty years, this "consistency" requirement was toothless: the Sentencing Commission did not issue any policy statement on compassionate release until 2006. See USSG §1B1.13 (2006). This inaction persisted despite Congress's express instruction that the Sentencing Commission "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t).

When the dam broke and a policy statement was eventually issued, that statement mostly mirrored the then-current statutory

- 11 -

language.[5]  See USSG §1B1.13 (2006).  Later, the Sentencing Commission identified some extraordinary and compelling reasons in the commentary to section 1B1.13.  See id. §1B1.13 cmt. n.1 (A)-(D).  At the time the FSA was enacted, this compendium included four categories of extraordinary and compelling reasons:  medical conditions; age; family circumstances; and a catch-all for other reasons deemed appropriate by the BOP.  See id.

That list remains unchanged today.  Neither the policy statement nor the commentary — at least explicitly — say that non-retroactive changes in sentencing law may constitute an extraordinary and compelling reason for compassionate release.  In order to put this appeal into perspective, then, we evaluate the effect, if any, of section 1B1.13 on the defendant's effort to obtain compassionate release.

To perform this evaluation, our starting point is the relevant text of both the statute and the current policy statement. See United States v. Smith, 954 F.3d 446, 448 (1st Cir. 2020). The statute demands that an inquiring court consider whether a reduction is "consistent with" policy statements that are

_____

[5] We say "mostly" because section 1B1.13 also requires a finding that the defendant is not dangerous in order to grant compassionate release based on extraordinary and compelling reasons.  See USSG §1B1.13(2); 18 U.S.C. § 3582(c)(1)(A)(i); see also Texeira-Nieves, 23 F.4th at 54 n.3.  This requirement reflects a mandate contained in a different provision — 18 U.S.C. § 3582(c)(1)(A)(ii).

- 12 -

"applicable." 18 U.S.C. § 3582(c)(1)(A). But there is a rub: section 1B1.13 was last modified in November of 2018 — before the FSA amended the compassionate-release statute to allow for prisoner-initiated motions. The obvious question, then, is whether this policy statement is "applicable" to motions of a type that did not exist when it was written. To resolve this question, we turn principally to the language of the policy statement itself.

The text of the current policy statement makes pellucid that it is "applicable" only to motions for compassionate release commenced by the BOP. Section 1B1.13 starts with a description of the condition that the compassionate-release process must be initiated by the BOP. See USSG §1B1.13 ("Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(a)(1) . . . ."). This imperative is a "direct textual instruction" and describes a "central statutory feature of the compassionate release scheme prior to the [FSA]." United States v. Long, 997 F.3d 342, 358 (D.C. Cir. 2021). The policy statement is therefore not "applicable," on a literal reading, to motions brought by prisoners; it applies only to motions brought by the BOP. See id. at 357 (determining that policy statement is "facially inapplicable" to prisoner-initiated motions); United States v. McCoy, 981 F.3d 271, 282 & n.7 (4th Cir. 2020); United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020); United States v. Brooker, 976 F.3d 228, 235-36 (2d Cir. 2020).

The Sentencing Commission's commentary to the policy statement reinforces this view. See USSG §1B1.13 cmt. n.1-5. Such commentary is generally considered as authoritative (with exceptions not applicable here). See Stinson v. United States, 508 U.S. 35, 38 (1993); see also Long, 997 F.3d at 356. The commentary confirms that the policy statement applies only to motions filed by the BOP. It reiterates that "[a] reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons pursuant to 18 U.S.C. § 3582(c)(1)(A)." USSG §1B1.13 cmt. n.4. A prisoner-initiated motion for compassionate release cannot — by the Sentencing Commission's own words — be brought under "th[at] policy statement." Id.; see McCoy, 981 F.3d at 282; Brooker, 976 F.3d at 236.

To find the existing policy statement "applicable" to prisoner-initiated motions, we would need to excise the language referring to motions brought by the BOP. That would be major surgery and undertaking it would be well outside our proper interpretive province. See, e.g., Long, 997 F.3d at 356; McCoy, 981 F.3d at 282. We may not "blue pencil" unambiguous text to divorce it from its context.[6] Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 141-142 (1985).

---

[6] Let us be perfectly clear. We do not suggest that the current policy statement is invalid but, rather, we read it as

Of course, the Sentencing Commission has left its policy statement intact, without amendment, since the FSA first allowed for prisoner-initiated motions for compassionate release. This passivity on the Commission's part arguably might spawn an inference that the Commission found the current policy statement to remain responsive notwithstanding the broadening of the compassionate-release statute. Here, however, there is no fertile ground for any such inference. The simple fact of the matter is that the Sentencing Commission has lacked a quorum for most of the time that has elapsed since the FSA's passage. See Guerrant v. United States, 142 S. Ct. 640, 640-41 (2022) (statement of Sotomayor, J., joined by Barrett, J.); Saccoccia, 10 F.4th at 7. Consequently, it has not had any realistic opportunity to issue a post-FSA policy statement. Viewed against this backdrop, the Sentencing Commission's silence does not suggest that it regards any part of its current policy statement as applicable to prisoner-initiated motions for compassionate release. See Long, 997 F.3d at 355 (explaining that Sentencing Commission has "never suggested that its existing policy statement applies to defendant motions

_____

applicable only to a limited context — compassionate-release motions brought by the BOP. See United States v. Jones, 980 F.3d 1098, 1111 n.19 (6th Cir. 2020); Brooker, 976 F.3d at 236. The conclusion that the current policy statement remains valid with respect to compassionate-release motions brought by the BOP but not as to those brought by prisoners is not internally inconsistent.

- 15 -

under the First Step Act"); McCoy, 981 F.3d at 283 (declining to assume what Sentencing Commission would decide following the FSA).

For these reasons, we hold that a district court is not constrained by the existing policy statement on compassionate release when adjudicating a motion brought by a prisoner. This holding aligns our court with the overwhelming majority of the courts of appeals that have decided the issue. See United States v. Andrews, 12 F.4th 255, 259 (3rd Cir. 2021); Long, 997 F.3d at 359; United States v. Aruda, 993 F.3d 797, 802 (9th Cir. 2021) (per curiam); United States v. Shkambi, 993 F.3d 388, 392-93 (5th Cir. 2021); United States v. McGee, 992 F.3d 1035, 1050 (10th Cir. 2021); McCoy, 981 F.3d at 282; United States v. Jones, 980 F.3d 1098, 1101 (6th Cir. 2020); Gunn, 980 F.3d at 1180; Brooker, 976 F.3d at 230.

We recognize that there is an outlier. A divided panel of the Eleventh Circuit has held that the current policy statement applies to prisoner-initiated motions. See United States v. Bryant, 996 F.3d 1243, 1247 (11th Cir.), cert. denied, 142 S. Ct. 583 (2021). That holding, though, is based mainly on the court's insistence that an "applicable policy statement" is merely one that is "capable of being applied" or "relevant." Id. at 1252-53. This tautological approach may have a certain superficial appeal, but "there are situations in which rigid adherence to semantic orthodoxy must yield to common sense." United States ex

- 16 -

rel. Ondis v. City of Woonsocket, 587 F.3d 49, 57 (1st Cir. 2009). Although the Bryant majority purported to analyze the phrase "applicable policy statements" in the statutory "context and with a view to [its] place in the overall statutory scheme," Sturgeon v. Frost, 136 S. Ct. 1061, 1070 (2016) (quotations omitted), such context and scheme make luminously clear that the current policy statement cannot be "applicable" to prisoner-initiated motions.

Congress authorized the Sentencing Commission to promulgate "general policy statements" that would "further the purposes set forth in" 18 U.S.C. § 3553(a)(2), including "the appropriate use of . . . the sentence modification provisions" in section 3582(c). See 28 U.S.C. § 994(a)(2)(C). Section 603(b) of the FSA fundamentally changed the compassionate-release mechanism. The amendment, entitled "Increasing the Use and Transparency of Compassionate Release," created a new regime in which — for the first time — prisoners may seek compassionate release even when the BOP does not deign to act on their behalf. FSA § 603(b), 132 Stat. at 5239. By empowering district courts to grant compassionate release in response to a prisoner's own request, the amendment effected a paradigm shift in how compassionate release would function. Given the profound nature of this paradigm shift, it is fair to say that the "purposes" and "appropriate use" of the compassionate-release statute (to use the language of 28 U.S.C. § 994(a)(2)(C)) have swelled beyond those that inhered in the

- 17 -

statute when the Sentencing Commission issued its original policy statement. It would blink reality to assume that the Sentencing Commission would think that the only modifications necessary to the existing policy statement would be to disregard the references to motions brought by the BOP.

If more were needed — and we doubt that it is — Application Note 1(D) of the commentary cinches the matter. See USSG §1B1.13 cmt. n.1(D). This note requires that "other" extraordinary and compelling reasons — that is, reasons not specifically described in the commentary — must be "determined by the Director of the [BOP]." Id. Such a requirement is plainly a relic of the outdated regime by which the BOP would in all cases weigh the merits of a compassionate-release request and then file a motion only if it judged the request worthy. To "assume that Application Note 1(D) w[ould] survive unchanged in a post-First Step Act world," McCoy, 981 F.3d at 283, would require throwing reasoned analysis to the winds and replacing it with sheer conjecture.

The government adopts a contrary stance, suggesting that it would not be inconsistent to apply the requirement specified in Application Note 1(D) to prisoner-initiated motions. In its telling, the FSA's changes to the compassionate-release mechanism are merely procedural. See Bryant, 996 F.3d at 1248, 1263-64. This suggestion elevates hope over reason: the FSA did more than

alter procedural aspects of the compassionate-release process. It worked a paradigm shift, which brought about "material changes," expanding opportunities for compassionate release after a long history of poor implementation and rare use.[7] Brooker, 976 F.3d at 231-34; see McGee, 992 F.3d at 1041. Seen in this real-world context, an "applicable" policy statement, binding on courts adjudicating motions brought by prisoners, surely would require the Sentencing Commission's judgment on the "appropriate" use of the compassionate-release mechanism as reconfigured by the FSA. See Long, 997 F.3d at 359 (explaining that an "applicable" policy statement would "take account of the relevant legislation and the congressional policy"); McCoy, 981 F.3d at 283.

The short of it is that the Sentencing Commission's current policy statement is not applicable to prisoner-initiated motions for compassionate release, and the Commission has not yet issued a policy statement applicable to such motions. The policy statement referred to by the district court (that is, the current policy statement) is applicable only to compassionate-release

---

[7] The statistics tell the tale. There has been a sharp increase in both filings and grants of compassionate-release motions since the FSA's passage. See Brooker, 976 F.3d at 233. For instance, the Sentencing Commission reported only twenty-four grants of compassionate release in fiscal year 2018. See U.S. Sent'g Comm'n, The First Step Act of 2018: One Year of Implementation 47 & n.143 (Aug. 2020). Since the FSA was passed in December of 2018, the number of such grants has swelled to over 4,000. See BOP, First Step Act, https://www.bop.gov/inmates/fsa (last visited Feb. 14, 2022).

- 19 -

motions brought by the BOP. We hold, therefore, that district courts — when adjudicating prisoner-initiated motions for compassionate release — have discretion, unconstrained by any policy statement currently in effect, to consider whether a prisoner's particular reasons are sufficiently extraordinary and compelling to warrant compassionate release. See McCoy, 981 F.3d at 284 (holding that because there is no "applicable" policy statement, "district courts are 'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise'" (quoting Brooker, 976 F.3d at 230)); Gunn 980 F.3d at 1180 (similar).

For the sake of completeness, we hasten to add that the absence of an applicable policy statement does not mean that a district court's discretion when adjudicating a prisoner-initiated motion for compassionate release is unbounded. As Judge Easterbrook put it, the absence of applicable policy statement does not "creat[e] a sort of Wild West in court, with every district judge having an idiosyncratic release policy." Gunn, 980 F.3d at 1180. After all, the district court's discretion remains circumscribed by statutory standards, which obligate the district court to find a reason that is both "extraordinary and compelling." 18 U.S.C. § 3582(c)(1)(A)(i); see United States v. Canales-Ramos, 19 F.4th 561, 566 (1st Cir. 2021) ("[T]he 'extraordinary and compelling' standard is logically guided by the plain meaning of

those terms."). And, moreover, the current policy statement —
though not "applicable" — nonetheless may serve as a non-binding
reference. See Andrews, 12 F.4th at 260; Aruda, 993 F.3d at 802;
United States v. Tomes, 990 F.3d 500, 503 n.1 (6th Cir. 2021);
McCoy, 981 F.3d at 282 n.7; Gunn, 980 F.3d at 1180.

Last but not least, we recognize that the situation is
fluid. The Sentencing Commission's lack of a quorum has stymied
the Commission from issuing policy statements. See Guerrant, 142
S. Ct. at 640-41 (statement of Sotomayor, J., joined by Barrett,
J.). If and when the Sentencing Commission issues updated guidance
applicable to prisoner-initiated motions for sentence reductions
consistent with both section 3582(c)(1)(A) and the Sentencing
Commission's statutory mandate under section 994(t), district
courts addressing such motions not only will be bound by the
statutory criteria but also will be required to ensure that their
determinations of extraordinary and compelling reasons are
consistent with that guidance. See Saccoccia, 10 F.4th at 7.
Until then, however, the district courts will have to assess
prisoner-initiated motions for compassionate release primarily
through the lens of the statutory criteria, subject to review on
appeal.

**B**

The central question remains. That question asks
whether a district court — in the absence of an applicable policy

- 21 -

statement — may permissibly consider the FSA's non-retroactive amendments to the mandatory minimum penalties under section 841(b)(1)(A) on an individualized basis to determine whether an extraordinary and compelling reason for compassionate release exists in a particular case. The district court answered this question in the negative, determining that such prospective changes in sentencing law could never form part of the basis of an extraordinary and compelling reason. Thus, it refused to consider those changes at all regardless of their manifestation in the defendant's particular circumstances (such as his relatively young age at the time he began serving his life term and the gross disparity between his pre-FSA mandatory sentence and his putative post-FSA mandatory minimum). In support, the court reasoned chiefly that any contrary conclusion would "effectively establish[] a judicial exception to the general rule of prospective effect of legislative enactments." We do not agree.

Although this issue is one of first impression for our court, we do not write on a pristine page. Several courts of appeals have addressed the issue. Three of those courts have concluded that a district court's discretionary authority under section 3582(c)(1)(A) does not allow consideration of the FSA's non-retroactive changes in sentencing law in the course of determining whether an extraordinary and compelling reason exists. See United States v. Crandall, ___ F.4th ___, ___ (8th Cir. 2022)

[No. 20-3611, slip op. at 6]; Andrews, 12 F.4th at 261-62; United States v. Thacker, 4 F.4th 569, 574 (7th Cir. 2021). Two of these courts have suggested that such sentencing disparities may be considered by a district court only in weighing the section 3553(a) factors, see Andrews, 12 F.4th at 262; Thacker, 4 F.4th at 576 — an issue that need not be reached unless and until the court first finds that an extraordinary and compelling reason exists.

Two other courts of appeals have come to a different conclusion. Each of those courts has concluded that there is enough play in the joints for a district court to consider the FSA's non-retroactive changes in sentencing law (in combination with other factors) and find an extraordinary and compelling reason in a particular case, without doing violence to Congress's views on the prospective effect of the FSA's amendments. See McGee, 992 F.3d at 1045-48; McCoy, 981 F.3d at 285-87. Specifically, the Fourth Circuit has held that a district court may permissibly treat as an extraordinary and compelling reason the disparity between a defendant's sentence and that provided for under the FSA's amendments, emphasizing that such a judgment is appropriate only after an individualized inquiry "basing relief not only on the [FSA's] change to sentencing law . . . but also on [other] factors." McCoy, 981 F.3d at 288. So, too, the Tenth Circuit has held that "the fact a defendant is serving a pre-FSA mandatory life sentence imposed under [section] 841(b)(1)(A) cannot,

standing alone, serve as a basis for the sentence reduction under [section] 3582(c)(1)(A)(i)" but that "the combination of such a sentence and a defendant's unique circumstances" may "constitute 'extraordinary and compelling reasons.'" McGee, 992 F.3d at 1048.[8]

Once again, our analysis begins with the text of the relevant statutes. Section 3582(c)(1)(A)(i) requires that before granting a sentence reduction, the district court must find an extraordinary and compelling reason warranting relief. In the absence of an applicable policy statement, there is only one explicit limitation on what may comprise an extraordinary and compelling reason. Congress has stated plainly — in a separate statute authorizing the Sentencing Commission to issue general policy statements — that "[r]ehabilitation . . . alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Nowhere has Congress expressly prohibited district courts from considering non-retroactive changes in sentencing law like those in section 401 of the FSA. Such a prohibition cannot

---

[8] Divided panels of the Sixth Circuit have straddled the fence and placed that court on both sides of the decisional divide. Compare United States v. Jarvis, 999 F.3d 442, 443-45 (6th Cir. 2021), cert. denied, 142 S. Ct. 760 (2022) (holding consideration of non-retroactive FSA changes impermissible), with United States v. Owens, 996 F.3d 755, 764 (6th Cir. 2021) (holding to contrary). A panel has recently endorsed a decision that aligns the court with the Third, Seventh, and Eighth Circuits. See United States v. McKinnie, ___ F.4th ___, ___ (6th Cir. 2022) [No. 21-3608, slip op. at 7] (endorsing Jarvis, not Owens, as law of circuit). But see United States v. McCall, 20 F.4th 1108, 1114 (6th Cir. 2021) (describing Jarvis as "creat[ing] an intra-circuit split").

be deduced from section 3582(c)(1)(A)'s requirement that a court consider the section 3553(a) factors when granting a sentence reduction. No part of this requirement suggests that a district court is precluded from considering issues relevant to those sentencing factors at the separate step of determining whether an extraordinary and compelling reason exists. Were this the case, there would have been no reason for Congress to caution that rehabilitation — a relevant consideration in the section 3553(a) inquiry — could not constitute an extraordinary and compelling reason.

Nor do we see any textual basis in the FSA for a categorical prohibition anent non-retroactive changes in sentencing law. The provision describing the effect of the FSA's relevant amendments limits the application of those amendments to "apply to any offense that was committed before the date of enactment of this Act, if a sentence for the offense has not been imposed as of such date of enactment." See FSA § 401(c), 132 Stat. at 5221. Neither this provision nor any other provision in the FSA indicates that Congress meant to deny the possibility of a sentence reduction, on a case-by-case basis, to a defendant premised in part on the fact that he may not have been subject to a mandatory sentence of life imprisonment had he been sentenced after passage of the FSA. See McGee, 992 F.3d at 1047. And to the extent (if at all) that we might be able to infer any

- 25 -

congressional understanding of the scope of "extraordinary and compelling" derived from the Sentencing Commission's policy statement that existed at the time Congress enacted the FSA, the text of that policy statement offers no support for such a categorical prohibition. After all, the catch-all provision of the commentary to the policy statement allows the BOP to determine other extraordinary and compelling reasons, and in no way suggests that the Sentencing Commission intended to circumscribe the scope of what is "extraordinary and compelling." See USSG §1B1.13 cmt. n.1(D). This reading of the catch-all provision is consistent with the Sentencing Commission's statutory mandate that it "describe" (and not define) what should be considered an "extraordinary and compelling" reason. See 28 U.S.C. § 994(t).

On the whole, given the language that Congress deliberately chose to employ, we see no textual support for concluding that such changes in the law may never constitute part of a basis for an extraordinary and compelling reason. We are, moreover, reluctant to infer that Congress intended such a categorical and unwritten exclusion in light of its specific statutory exclusion regarding rehabilitation. See TRW Inc. v. Andrews, 534 U.S. 19, 28 (2001); see also Pritzker v. Yari, 42 F.3d 53, 68 (1st Cir. 1994) ("As the maxim teaches, 'expressio unius est exclusio alterius.'").

Our view that a district court may consider the FSA's prospective amendments to sentencing law as part of the "extraordinary and compelling" calculus fits seamlessly with the history and purpose of the compassionate-release statute. In abolishing federal parole, Congress recognized the need for a "safety valve" with respect to situations in which a defendant's circumstances had changed such that the length of continued incarceration no longer remained equitable. See S. Rep. No. 98-225, 55-56, 121 (1983), as reprinted in 1984 U.S.C.C.A.N. 3182, 3238-39, 3304 (contemplating that circumstances may present justifying a reduction of an "unusually long sentence"); McGee, 992 F.3d at 1046-47. To serve as a safety valve, section 3582(c)(1)(A) must encompass an individualized review of a defendant's circumstances and permit a sentence reduction — in the district court's sound discretion — based on any combination of factors (including unanticipated post-sentencing developments in the law). See Setser v. United States, 566 U.S. 231, 242-43 (2012) ("[W]hen the district court's failure to anticipate developments that take place after the first sentencing produces unfairness to the defendant," section 3582(c)(1)(A) "provides a mechanism for relief." (quotations and alteration omitted)).

The court below adopted a contrary view, concluding that the FSA's prospective changes cannot be considered in any case

because Congress made those changes non-retroactive. The force of this conclusion derives largely from three arguments.

The first argument is that a district court would usurp Congress's judgment were it to grant a sentence reduction in favor of a defendant for whom Congress had determined retroactive relief was inappropriate. See Crandall, ___ F.4th at ___ [No. 20-3611, slip op. at 6]; Andrews, 12 F.4th at 261 (describing issue as "sow[ing] conflict" with provision requiring prospective application of the FSA's changes to section 924(c)); Thacker, 4 F.4th at 574 (positing that section 3582(c)(1)(A) "cannot be used to effect a sentencing reduction at odds with Congress's express determination"); United States v. Jarvis, 999 F.3d 442, 444 (6th Cir. 2021), cert. denied, 142 S. Ct. 760 (2022) ("If every defendant who received a longer sentence than the one he would receive today became eligible for compassionate release, the balance Congress struck would come to naught."). The second argument is that by granting such relief, a district court would offend other congressional judgments like those regarding appropriate penalties, the limited avenues for collateral challenges, and the rule of finality that traditionally attaches to criminal sentences. See Crandall, ___ F.4th at ___ [No. 20-3611, slip op. at 7]; Andrews, 12 F.4th at 261; Thacker, 4 F.4th at 574. The third argument rests on the notion that a sentence legally imposed cannot itself be considered "extraordinary." See

Crandall, ___ F.4th at ___ [No. 20-3611, slip op. at 6-7]; Andrews, 12 F.4th at 261; Thacker, 4 F.4th at 574.

These arguments, whether appraised singly or collectively, cannot bear the weight of the district court's conclusion. They cannot support a categorical rule that non-retroactive changes in sentencing law, even when considered on an individualized basis, may never support a reason for a sentence reduction under section 3582(c)(1)(A).

To be sure, the first two arguments present a fair concern: if a district court were to reduce a sentence solely because one of the FSA's non-retroactive amendments would have lowered a defendant's sentence, it might be seen as substituting its own judgment on retroactivity for Congress's judgment and — in the bargain — offending the rule of finality. But that critique knocks down a straw man: we in no way suggest that the FSA's non-retroactive amendments "simultaneously creat[ed] an extraordinary and compelling reason for early release." Andrews, 12 F.4th at 261. There is a salient "difference between automatic vacatur and resentencing of an entire class of sentences" on the one hand, "and allowing for the provision of individual relief in the most grievous cases" on the other hand. McGee, 992 F.3d at 1047 (quoting McCoy, 981 F.3d at 286-87). Congress's judgment to prevent the former is not sullied by a district court's determination, on a case-by-case basis, that a particular

defendant has presented an extraordinary and compelling reason due to his idiosyncratic circumstances (including that his mandatory minimum sentence under section 841(b)(1)(A) would have been significantly shorter under the FSA).  See id.  As long as the individualized circumstances, taken in the aggregate, satisfy the "extraordinary and compelling" standard, granting relief would be consistent with Congress's judgment that a modification of a sentence legally imposed may be warranted when extraordinary and compelling reasons for taking that step exist.  See McCoy, 981 F.3d at 288.  And conversely, this part of the compassionate-release statute is no help to a defendant who presents only ordinary reasons.  See Saccoccia, 10 F.4th at 5 ("Words like 'extraordinary' and 'compelling,' when used by Congress in framing a statute, must be given their plain meaning.").

The third argument furnishes an even weaker foundation for the district court's categorical rule.  The thrust of this argument is that Congress's judgment to limit the retroactivity of certain changes in the FSA affecting sentencing exposure can never be considered extraordinary and compelling because "there is nothing 'extraordinary' about leaving untouched the exact penalties that Congress prescribed and that a district court imposed for particular violations of a statute."[9]  Thacker, 4 F.4th

---

[9] The government suggests that we have supported this view as a matter of law.  That suggestion relies on an unpublished

at 574. Even if this statement rings true in many situations, we do not see how it can be stated in such absolute terms with respect to compassionate-release motions. After all, a district court's individualized consideration of a defendant's circumstances in connection with a compassionate-release motion may require it to assess interactions among a myriad of factors. Judges do not have crystal balls, and courts cannot predict how this mix of factors — including non-retroactive changes in sentencing law — will play out in every case. Ultimately, then, it is within the district court's discretion — constrained only by the statutory criteria and any applicable policy statement — to make that assessment, case by case.

To say more would be to paint the lily. We hold that the district court's categorical exclusion of non-retroactive changes in sentencing law from the "extraordinary and compelling" calculus is neither consistent with the relevant statutory text nor compelled by the arguments embraced by the district court. While we agree that the mere fact of a "pre-First Step Act mandatory life sentence imposed under [section] 841(b)(1)(A)

judgment, see United States v. De Jesús, No. 19-2210, 2020 WL 9597494, at *1 (1st. Cir. July 23, 2020) (unpublished judgment), cert. denied, No. 20-7694, 2021 WL 1952111, at *1 (U.S. May 17, 2021) — a judgment that lacks precedential effect, see 1st Cir. Rule 32.1. What is more, the government's suggestion misreads De Jesús. We determined there only that the district court's denial of relief was within its discretion given the circumstances presented in that case.

cannot, standing alone, serve as the basis for a sentence reduction under [section] 3582(c)(1)(A)(i)," McGee, 992 F.3d at 1048, that is only part of the picture. The other part of the picture is decisive here: it is within the district court's discretion, in the absence of a contrary directive in an applicable policy statement, to determine on a case-by-case basis whether such changes in law predicated on a defendant's particular circumstances comprise an extraordinary and compelling reason and, thus, satisfy the standard for compassionate release under section 3582(c)(1)(A)(i). See id.; McCoy, 981 F.3d at 288.

## C

The government has a fallback position. It contends that we may still affirm the district court's decision to deny compassionate release for a different reason. In its view, the district court's decision ought to be upheld because the defendant's circumstances show that compassionate release is simply not warranted. The government notes, for example, that apart from the mandatory minimum, the defendant had a guideline sentencing range of life imprisonment.

The government's contention impermissibly compresses the required analysis. The district court's error related to an issue of law, which reflected a misunderstanding of the scope of its discretion in determining whether an extraordinary and compelling reason existed sufficient to warrant compassionate release. It

did not proceed to an individualized assessment of whether the FSA's non-retroactive changes, coupled with the defendant's individualized circumstances, warranted compassionate release. Indeed, the court did not consider the defendant's individualized circumstances at all. Nor did the court undertake a section 3553(a) analysis. See Texeira-Nieves, 23 F.4th at 52 (explaining that appellate review is facilitated when district court proceeds to review sentencing factors). On this record, we cannot affirm the district court's decision as a proper exercise of its discretion.

## III

We need go no further. As a general matter, a district court, reviewing a prisoner-initiated motion for compassionate release in the absence of an applicable policy statement, may consider any complex of circumstances raised by a defendant as forming an extraordinary and compelling reason warranting relief. It follows that a district court adjudicating such a motion may consider the FSA's non-retroactive amendments to the scope of the mandatory minimum penalties under section 841(b)(1)(A) on a case-by-case basis grounded in a defendant's individualized circumstances to find an extraordinary and compelling reason warranting compassionate release. The court below erred by concluding, as a matter of law, that the FSA's prospective changes to the mandatory minimum penalties could not — even when considered

- 33 -

on an individualized basis — support a reason for compassionate release.  Accordingly, the judgment must be vacated and the matter remanded for further proceedings consistent with this opinion.  We take no view as to the outcome of those further proceedings.

**<u>Vacated and Remanded</u>**.

**— Concurring Opinion Follows —**

**BARRON, Circuit Judge, concurring**. Judge Selya convincingly explains why, under the First Step Act, a prospective legislative change that reduces the length of a mandatory minimum sentence for an offense can give rise -- in certain cases -- to an "extraordinary and compelling reason" to reduce a sentence that was imposed for that same offense prior to that change. See 18 U.S.C. § 3582(c)(1)(A)(i). I thus join his excellent opinion in full. I write separately only to give some texture to that conclusion by referencing a case that this Court encountered before the First Step Act had been enacted.

The case involved Wendell Rivera-Ruperto's ("Rivera's") unsuccessful federal constitutional challenge to the mandatory prison sentence that he received for having been convicted of six counts of violating 18 U.S.C. § 924(c).[10] See United States v. Rivera-Ruperto (Rivera-Ruperto I), 846 F.3d 417 (2017); United States v. Rivera-Ruperto (Rivera-Ruperto II), 852 F.3d 1 (1st Cir. 2017); United States v. Rivera-Ruperto (Rivera-Ruperto III), 884 F.3d 25 (1st Cir. 2018) (denial of petition for rehearing en banc). That mandatory sentence was for 130 years of imprisonment, Rivera-Ruperto II, 852 F.3d at 5, and, as such, "could not have been harsher save for a sentence of death," Rivera-Ruperto III, 884 F.3d at 30 (Barron, J., concurring in the denial of rehearing en

---

[10] Rivera raised other issues on appeal that are not relevant here.

- 35 -

banc, joined by all then-active First Circuit judges and Judge Lipez). Yet, if Rivera were sentenced today for those same offenses, the mandatory prison term to which he would be subject would be a century shorter. And, that is because of an amendment to § 924(c) that Congress made in the First Step Act itself when it also expanded in that same statute the circumstances in which a reduction to a previously imposed sentence could be sought for an "extraordinary and compelling reason." See First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.

To understand how the First Step Act's amendment to § 924(c) would bring about such a stark sentencing differential, it helps to wind back the clock almost a decade to when Rivera was sentenced for his § 924(c) convictions. Then, as now, § 924(c) made it a crime for an individual to "use[] or carr[y] a firearm" "during and in relation to any crime of violence or drug trafficking crime" or to "possess[] a firearm" "in furtherance of any such crime." 18 U.S.C. § 924(c)(1)(A). And then, as now, the mandatory minimum sentence for an individual convicted of that offense was a term of imprisonment of at least five years.[11] Id. § 924(c)(1)(A)(i).

---

[11] The mandatory minimum increases if additional facts relating to the the individual's use of the firearm are found by a jury. See id. § 924(c)(1)(A)(ii)-(iii).

- 36 -

In addition, the statute provided then for a twenty-five-year mandatory minimum sentence for any "second or subsequent conviction" for violating § 924(c). Id. § 924(c)(1)(C). And further, the statute provided at that time that each mandatory twenty-five-year prison sentence was to be served consecutively, such that the mandatory prison sentences that the statute required to be imposed would have to be stacked one upon another, resulting in mandatory prison sentences in some cases that could easily exceed the span of any defendant's life.

Moreover, at the time of Rivera's convictions and sentence, the Supreme Court had construed § 924(c) (in a sharply divided ruling over a strong dissent) in a way that made it even harsher than I have just described it to be. The Supreme Court had done so by construing the "second or subsequent conviction" phrase to encompass a follow-on § 924(c) conviction even if none of the defendant's preceding § 924(c) convictions had become final and even if each of those earlier convictions had been for a violation of § 924(c) that had occurred before the defendant had been convicted under § 924(c) even once. See Deal v. United States, 508 U.S. 129, 136 (1993).

In consequence, Rivera was subject not only to a mandatory prison sentence of five years for his first § 924(c) conviction but also to a mandatory prison sentence of twenty-five years for each of his five additional § 924(c) convictions, with

each of those twenty-five-year mandatory prison sentences to be served consecutively. And that was so, notwithstanding that Rivera -- who had no prior criminal history of any kind -- had committed each of his six § 924(c) violations roughly contemporaneously and before he had been convicted of committing any of them.

Thus, although Rivera had not been convicted of committing any crime prior to being convicted under § 924(c), and although he was in no sense a § 924(c) recidivist -- as he had committed no such offense after already having been punished for violating that same statute -- he received a mandatory, greater-than-life prison sentence for his § 924(c) convictions. In other words, solely in consequence of the disputed way in which § 924(c) had been construed in Deal, he was subjected to a mandatory prison sentence that was just as harsh as the mandatory one that he would have been subjected to if he had been a true § 924(c) recidivist five times over or if he had an extensive criminal history before he had committed the first such violation. See Rivera-Ruperto III, 884 F.3d at 25-26 & n.2.

Recognizing how harsh Deal's construction of § 924(c) was, Congress chose in the First Step Act -- while also expanding the ability of those serving lengthy prison sentences to seek reductions of them for an "extraordinary and compelling reason" -- to supersede that construction. Specifically, Congress

amended § 924(c) so that, going forward, the twenty-five-year mandatory minimum sentence is triggered only by a "violation of [§ 924(c)] that occurs after a prior conviction under [§ 924(c)] has become final." See First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.

The result is that, by virtue of the First Step Act, if Rivera were sentenced today for his same § 924(c) convictions, none of them would subject him to the twenty-five-year mandatory minimum. And so, he would not be subject today to a mandatory prison sentence for all of them that would exceed his natural life.

True, Congress did not choose in the First Step Act to make this amendment to § 924(c)'s stacking regime retroactive. See Pub. L. No. 115-391 § 403(b), 132 Stat. 51. But, for reasons that Judge Selya's opinion well explains, it does not follow that Congress in passing the First Step Act wished to foreclose every individualized request that a prisoner sentenced under the prior stacking regime might bring pursuant to the expanded mechanism for seeking sentence reductions that Congress chose to make newly available in that same statute. In fact, a case like Rivera's, in my view, makes vivid the reason to conclude that such a request could, in some cases, be understood to be asserting a reason for a sentence reduction of just the "extraordinary and compelling" kind that Congress contemplated in expanding that mechanism.

I say that only partly because virtually the entirety of mandatory, 100-years-plus prison term for Rivera arose from a construction of § 924(c) that was itself highly disputed at the time as to whether it reflected Congress's intent, see Deal, 508 U.S. 129, 138 (Stevens, J., dissenting), and that Congress has now superseded in the First Step Act itself. I say that also because the stacking of multiple mandatory twenty-five-year-long prison sentences to which he was subject -- notwithstanding his lack of any criminal history -- resulted from a quirk in our Circuit's case law that precluded him from benefiting from the rule that offenses committed in a single course of conduct must be treated as part of a single conspiracy. See Rivera-Ruperto III, 884 F.3d at 33.

In fact, it was with these highly unusual features of Rivera's case in mind that we observed in considering his constitutional challenge to his no-hope sentence that "it is not realistic to posit that the Congress that enacted § 924(c) made a focused judgment that [every] defendant[] [convicted on multiple counts of § 924(c)] should receive a mandatory life-without-parole sentence" through the operation of the statute's stacking provisions. Rivera-Ruperto III, 884 F.3d at 41. It seems to me that the same reasons that led us to conclude that "it is pure fiction to imagine that Congress . . . was focused on", or even aware of, every possible offense combination that could trigger

the stacking requirement under the old Deal-inflected version of § 924(c), id. at 42, make it equally fictitious to conclude that Congress, by not making the First Step Act amendments to § 924(c) retroactive, meant categorically to foreclose any individualized reconsideration of a prior sentence imposed under the old § 924(c) stacking regime because Congress must have been of the view that all those prior sentences were appropriate.

Congress's choice in amending § 924(c)'s stacking regime to not reopen in categorical fashion all the core cases in which, under Deal v. United States, it was understood to apply, see 508 U.S. at 130 (considering a case in which "six bank robberies on six different dates" were tried all in the same case), does not indicate to me that Congress meant to deem any challenge to the continued incarceration of such an offender for more than a century beyond the time that Congress now concludes is warranted an "ordinary" or "less than compelling" one.  And, a case such as Rivera's, in which a mandatory sentence of such extreme length was imposed under the prior stacking regime for a confluence of reasons that no legislator could have had in mind when § 924(c) was originally enacted, illustrates why.

I recognize that some courts have held that a nonretroactive change in law cannot be deemed an "extraordinary and compelling" reason for reducing a sentence without thereby making such a legal change retroactive.  See, e.g., United States

v. Jarvis, 999 F.3d 442, 444 (6th Cir. 2021), cert. denied, 142 S. Ct. 760 (2022) ("That the First Step Act's amendments could amount to an extraordinary and compelling reason . . . fails to grapple with congressional design, expressed through the text of the statute, in which Congress chose not to make these sentencing amendments retroactive."); United States v. Thacker, 4 F.4th 569, 573-74 (7th Cir. 2021) ("[T]he discretionary authority conferred by § 3582(c)(1)(A) only goes so far.  It cannot be used to effect a sentencing reduction at odds with Congress's express determination . . . that the amendment to § 924(c)'s sentencing structure apply only prospectively.").  But, in Kimbrough v. United States, 552 U.S. 85 (2007), the Supreme Court upheld a sentencing judge's authority to give weight to a nonretroactive legal change in determining a sentence's length because of the light that the change could shed on the need for punishment, id. at 110.  And, even some of the very same courts that have construed the First Step Act's "extraordinary and compelling reason" phrase narrowly have themselves recognized that a related federal statute, 18 U.S.C. § 3553(a), permits a sentencing judge to give such a nonretroactive change in the law weight in determining the proper length of a sentence.  See, e.g., United States v. Andrews, 12 F.4th 255, 262 (3d Cir. 2021) ("[T]he current sentencing landscape may be a legitimate consideration for courts at the next step of the analysis when they weigh the § 3553(a) factors."); Thacker, 4

F.4th at 576 ("Congress's changes to the statutory sentencing scheme in § 924(c) might factor into a district court's individualized determination of whether the § 3553(a) factors weigh[] in favor of . . . early release."). It is thus difficult for me to see how a concern about respecting Congress's choice to make a statutory change nonretroactive has force here, given that I fail to see how a court may be thought to subvert congressional intent by considering nonretroactive changes to the law at the "extraordinary and compelling" stage of the analysis but not while weighing the § 3553(a) factors.

I also realize that some courts have concluded -- for reasons of statutory text -- that because a nonretroactive change in the law is a relatively humdrum occurrence, such a change cannot supply an "extraordinary and compelling reason" to reduce a sentence under the First Step Act. See, e.g., United States v. Crandall, No. 20-3611, 2022 WL 385920, at *3 (8th Cir. Feb. 9, 2022) ("Congress from time to time prospectively increases or decreases existing criminal penalties, so that circumstance may not be "extraordinary" as an empirical matter."); Thacker, 4 F.4th at 574 ("[T]here is nothing 'extraordinary' about leaving untouched the exact penalties that Congress prescribed and that a district court imposed for particular violations of a statute."). But, the premise of our holding is not that a nonretroactive legal change in and of itself can provide the "extraordinary and

compelling reason" to reduce the sentence.  It is that there may be an "extraordinary and compelling reason" to reduce the sentence when a particular statutory change is considered in the context of the defendant's individualized circumstances.  In my view, one need only have a case like Rivera's in mind to recognize the soundness -- textually and otherwise -- of that premise.